UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

BERNARD GRAVES,

|  | **SECOND AMENDED** |
| Plaintiff, | **COMPLAINT** |

-against-

16 CV 2268 (MKB) (VMS)

CITY OF NEW YORK, POLICE OFFICER BRIAN
MECSERI, and JOHN/JANE DOE # 1 - 20,

Defendants.   **JURY TRIAL DEMANDED**
------------------------------------------------------------------------x

Plaintiff Bernard Graves, by his attorneys, MoutonDell'Anno LLP, respectfully alleges:

## NATURE OF THE ACTION

1.      This is an action to recover money damages arising out of the violation of Mr. Graves's rights under the Constitution of the United States.

2.      Under a pattern and practice set and enforced by city officials, the New York City Police Department ("NYPD"), and New York City Police Officers stop, search, seize, arrest and issue summonses to individuals without probable cause in response to a requirement and constant pressure to meet a summons quota, in violation of the U.S. Constitution.

3.      Further, officers are being explicitly instructed to issue summonses regardless of whether any crime or violation has occurred but instead in order to meet a minimum quota ("ACTIVITY") requirement set forth by the NYPD.

4.      To encourage and drive this unlawful pattern and practice, the NYPD consistently punishes officers who issue fewer summonses, and rewards police officers who issue more summonses, regardless of whether or not there is probable cause to issue such summonses.

***Proof of the Existence of The NYPD's Unlawful Quota Policy***

5.      Proof of the existence of the NYPD's illegal quota policy comes not from a single source, but rather, from multiple and varying sources. Specifically, the existence of such a policy may be inferred from, *inter alia*, the following evidence: (1) tape recordings of commanding officers at the 41st Precinct; (2) tape recordings of commanding officers at the 81st Precinct; (3) an arbitrator's ruling, dated January 14, 2006, which expressly found that the NYPD had an illegal quota policy which violated Labor Law § 215-a; (4) statistical evidence from the New York State Office of Court Administration (:"OCA"), demonstrating that an overwhelming percentage of the summonses filed in Court by the NYPD – over 50% – are ultimately dismissed; and (5) empirical evidence from a study conducted by John Eterno, PhD., a retired captain from the NYPD and Chairperson of Graduate Studies in Criminal Justice at Molloy College and Eli Silverman, PhD., a Professor Emeritus at John Jay College of Criminal Justice and the Graduate Center of CUNY, which confirm the NYPD's relentless obsession with crime "numbers" exerts enormous pressure on commanding officers and has resulted in the unethical manipulation of crime statistics by such officers, and in furtherance of that manipulation, officers constantly issue summonses to individuals in the absence of probable cause in order to artificially create the statistical appearance of increased "activity."

***Direct Evidence of an Illegal Quota: The Tape Recordings of P.O. Polanco and P.O. Schoolcraft***

6.      Several police officers have attempted to inform the public at large, as well policy-making officials within the NYPD, of this unlawful and illegal practice of constantly and relentlessly pressuring officers to maintain a summons quota that has resulted in numerous and continuing constitutional violations of the residents of New York City.

7.      At least two (2) police officers, P.O. Adrian Schoolcraft and P.O. Adhyl Polanco, publicly came forward to provide evidence of the aforementioned incentives and pressures to increase the number of summonses issued by NYPD officers.

8.      P.O. Schoolcraft and P.O. Polanco have provided evidence of their own experiences, as well as tape-recordings of supervising officers from the 81st and 41st Precincts continuously instructing and pressuring officers to meet quotas in order to secure their jobs and avoid punishment.

9.      These tape recordings made by P.O. Polanco and P.O. Adrian Schoolcraft provide clear and overwhelming proof of the existence of the NYPD's illegal quota policy.

***Evidence of The NYPD's Quota Policy From Tape Recordings At The 41st Precinct***

10.      The tape recordings made by P.O. Polanco explicitly refer to the NYPD's quota requirements. For example, in one such recording, a superior officer states as follows: "I SPOKE TO THE [COMMANDING OFFICER] FOR ABOUT AN HOUR AND HALF. THE ACTIVITY [IS] **20 AND 1**. .....THEY WANT 20 [SUMMONSES] AND 1 [ARREST]. HOW? I DON'T KNOW..... ALRIGHT, SO IT'S 20 AND 1."

11.      Similarly, another superior officer at the 41st Precinct was recorded as stating as follows: "NEXT WEEK YOU COULD BE AT 25 (SUMMONSES) AND 1 (ARREST), YOU COULD BE AT 35 (SUMMONSES) AND 1 (ARREST) AND GUESS WHAT? UNTIL YOU DECIDE TO QUIT THIS JOB AND BECOME A PIZZA HUT DELIVERY MAN, THIS IS WHAT YOU'RE GOING TO BE DOING UNTIL THEN."

12.      Further, another supervisor was heard threatening: "THINGS ARE NOT GOING TO GET ANY BETTER, ITS GOING TO GET A LOT WORSE. IF YOU THINK 1 (ARREST)

AND 20 (SUMMONSES) IS BREAKING YOUR BALLS, GUESS WHAT? YOU ARE GOING TO BE DOING? YOU'RE GOING TO BE DOING <u>A LOT MORE</u>, A LOT MORE THAN WHAT YOU THINK."

13.  In fact, officers at the 41st Precinct were explicitly told that these quotas are "NON-NEGOTIABLE," and it is not a sufficient excuse that an officer simply did not observe sufficient summonsable and/or criminal activity to fulfill said quota.

14.  Specifically, Donald McHugh, the Commanding Officer of the 41st Precinct, stated about the quotas: "IT'S REALLY <u>NON-NEGOTIABLE</u>, 'CAUSE IF YOU DON'T DO IT NOW, I'M GONNA HAVE YOU WORK WITH THE BOSS TO MAKE SURE IT HAPPENS."

***Evidence of the NYPD's Quota Policy from Tape Recordings at the 81st Precinct***

15.  Similar recordings were made by P.O. Adrian Schoolcraft at the 81st Precinct. These recordings further confirm the existence of the NYPD's unlawful quota policy.

16.  For example, a supervising officer at the 81st Precinct was recorded as stating the exact number – and specific type – of summonses that each officers is expected to delivery every month: "HE WANTS AT LEAST 3 SEATBELTS (SUMMONSES), 1 CELL PHONE SUMMONS) AND 11 OTHERS (SUMMONSES)" per officer each month.

17.  On December 8, 2008, Deputy Inspector Mauriello, Commanding Officer of the 81st Precinct, berated his officers for not writing enough summonses per month: "I SEE EIGHT FUCKING SUMMONSES FOR A 20 DAY PERIOD OR A MONTH. IF YOU MESS UP, HOW THE HELL DO YOU WANT ME TO DO THE RIGHT THING BY YOU?"

18.     Another Supervising Officer issued the following warning, "I TOLD YOU LAST MONTH, *THEY'RE LOOKING AT THE NUMBERS. AIN'T ABOUT LOSING YOUR JOB, [BUT] THEY CAN MAKE YOUR JOB REAL UNCOMFORTABLE.*"

19.     Additionally, Chief of Transportation Michael Scagnelli, a three star Chief in charge of TRAFFICSTAT, was quoted as saying: "HOW MANY SUPERSTARS AND HOW MANY LOSERS DO WE HAVE? HOW MANY SUMMONSES DOES THE SQUAD WRITE? WE NEED MORE ACTIVITY. *IF YOUR PRODUCTIVITY FALLS BELOW PAR, EITHER YOU OR THE C.O. IS GOING TO HAVE TO ANSWER.*"

20.     Similarly, another superior officer stated as follows: "WE NEED 250'S, WE NEED ARRESTS, QUALITY OF LIFE ENFORCEMENT (C-SUMMONSES), COMMUNITY VISITS, WE NEED, GET *2 OF THEM IN A CAR, 3 ON FOOT.*"

21.     In fact, the NYPD is so obsessed with making their "numbers" that supervising officers literally instructed officers to issue summonses and make arrests when there was *no* evidence of any criminal activity whatsoever.

22.     Specifically, one supervisor instructed: "GO THROUGH THE MOTIONS AND *GET YOUR NUMBERS ANYWAY.* DON'T BE THE ONE CAUGHT OUT THERE. MARINO'S YELLING AT EVERYONE ABOUT THE POINTS."

23.     Additionally, on October 31, 2008, Mauriello ordered his officers to arrest virtually *everybody* they came in contact with at 120 Chauncey Street in Brooklyn, with or without probable cause: "EVERYBODY GOES. I DON'T CARE. YOU'RE ON 120 CHAUNCEY AND THEY'RE POPPING CHAMPAGNE? YOKE EM. PUT THEM THROUGH THE SYSTEM.

THEY GOT BANDANNAS ON, ARREST THEM. *EVERYBODY GOES TONIGHT*. THEY'RE UNDERAGE? FUCK IT."

24.      Similar orders were given by a Sergeant on November 23, 2008. "IF THEY'RE ON A CORNER, MAKE 'EM MOVE. IF THEY DON'T WANT TO MOVE, LOCK 'EM UP. DONE DEAL. YOU CAN ALWAYS ARTICULATE [A CHARGE] LATER."

25.      Thus, in effectuating the NYPD's illegal quota policy, police officers throughout the City were being instructed to arrest and summons fully innocent people for crimes that never occurred – for nothing more than standing on a street corner in their neighborhoods – and then "articulate" or create a charge later.

***Further Proof of the NYPD's Illegal Quota Policy: Written Directives by Chief Marino***

26.      In a 2005 arbitration hearing, P.O. David Velez – who had been punished for failing to reach his monthly quota – presented evidence that the 75th Precinct had instituted and was enforcing a policy that officers must meet "a quota of 10 (ten) summons per month" and "that the police officers in squad A-1 received lower marks on their evaluations if the officers did not meet 'this minimum requirement.'" *In the Matter of P.B.A. and City of New York*, Case # A-10699-04, at 9 (Jan. 14, 2006).

27.      Additionally, then Commanding Officer Michael Marino actually *reduced this directive to writing* and distributed it to all of the supervisors in the 75th Precinct.  *Id.*

28.      The aforementioned written directive ordered that supervising officers were required to evaluate officers based on their adherence to the minimum quota of summonses and arrests.  *Id.*

29.     Specifically, in a writing dated January 2004, C.O. Marino wrote the following

directive to his supervisors for their use in evaluating the performance of police officers:

>  (1) *35 or below* = 2.5 - unless you can show <u>significant</u> improvement
>  in last quarter.
>
>  (2) *Less than 11 collars* = low or less in Performance Area #2
>  (Apprehension/Intervention).
>
>  (3) *Less than 33 movers* = low or less in performance Area #5
>  (Vehicular Offenses/Accidents).
>
>  (4) *Less than 33 QOL [quality of life]* = low or less in Handling
>  Specific Offenses (Performance Area #6).
>
>  (5) *Any two above* = low or less in Behavioral Dimension #25
>  (Drive/Initiative) and/or Behavioral Dimension #18 (Problem
>  Recognition).

30.     As a result of Chief Marino's explicit directives, Sgt. Lurch issued a memo to all

officers in the 75th Precinct "remind[ing] [officers] that a FAILURE TO WRITE THE

*REQUIRED AMOUNT OF SUMMONSES* AND FAILURE TO MAKE THE REQUIRED

NUMBER OF ARREST FOR EACH RATING PERIOD WILL RESULT IN SUBSTANDARD

PERFORMANCE RATINGS." *Id.* at p. 10 (emphasis added).

### The NYPD's Quota Policy Is Struck Down As Illegal in January 2006

31.     While the NYPD denied the existence of any quota policy, the arbitrator

emphatically rejected defendants' claims

>  The Arbitrator finds that C.O. Marino's writing and Sergeant
>  Lurch's memo *could not have been clearer*: "failure to write the
>  required amount of summonses ... will result in substandard
>  performance ratings ..." Further, the asterisk in the goal column
>  makes it clear that [these] "goals" are monthly, quarterly and yearly.
>  The Arbitrator is *completely persuaded* that the "goals" column on
>  this memo meets the definition in Labor Law Section 215-a for
>  "quota" ... [Thus], the New York Police Department violated New

York State Labor Law Section 215-a by establishing and maintaining a summons quota...

*In the Matter of P.B.A. and City of New York*, Case # A-10699-04, at 11, 27 (Jan. 14, 2006) (emphasis added).

32.    Thus, notwithstanding defendants' claims to the contrary, the NYPD was found to have a quota policy that was not only unconstitutional and illegal, but also, violated New York State Labor Law Section 215-a.

***Notwithstanding The Arbitrator's Decision, The NYPD's Unlawful Quota Policy Continues To This Day.***

33.    Notwithstanding the Arbitrator's January 14, 2006 decision, to this day, police officers throughout the City are constantly pressured to meet the required minimum quota of summonses on a daily, weekly, and monthly basis.

34.    The NYPD's unlawful quota policy is not limited to the 41st, 81st and 75th Precincts. Rather, it exists in every precinct throughout the City of New York, and has continued in full force even after the arbitrator's decision of January 14, 2006.

35.    On July 16, 2015, a deposition of Police Officer Harold Taylor was taken.  At that time, P.O Taylor testified that "there is a quota, but they never tell you what it is," and that the quota is an "unwritten rule."

36.    When pressed as to whether this quota pertained to just him or the entire NYPD, P.O. Taylor responded that "[i]t pertains to the NYPD."

***The NYPD's Code Word for Quotas: "Activity"***

37.    While the NYPD continues to publicly deny the existence of any quotas – claiming that these are mere "productivity goals" – there can be no doubt that the commands and pressures

from supervising officers for subordinate officers to increase their "ACTIVITY" specifically refers to producing a predetermined minimum number of summonses, arrests and 250's.

38.     This is apparent from the title of the memo that was the subject of the 2006 arbitration decision, which was entitled "Squad Activity Expectations."

39.     The use of the word "activity" in that memo unequivocally refers to the requisite number of summonses needed to meet the quota, providing irrefutable evidence that any directives to increase "activity" correlate to a predetermined summons quota.

40.     Further, P.O. Schoolcraft's own low performance evaluation was based on his failure to adhere to NYPD's "activity" requirements, and upon every inquiry as to the NYPD's definition of "activity," he was repeatedly informed that activity was evaluated based on the number of summonses, arrests and UF 250 reports credited to an officer in a given month.

41.     For example, P.O. Schoolcraft specifically asked, "SO HOW CAN A POLICE OFFICER BRING UP HIS POINTS?," to which his sergeant responded "BY DOING ACTIVITY…SUMMONSES, COLLARS [ARRESTS]."

42.     Additionally, at one of the roll calls in the 81st Precinct, a supervising officer stated, "I WANT ACTIVITY. LISTEN. I WANT 250'S AND C SUMMONSES."

43.     Further another supervising officer issued the following order, "ANYBODY OVER THERE SELLING. HANGING OUT OVER THERE I DON'T CARE WHAT THEY'RE SELLING, THEY'RE GETTING SOMETHING. *I GOTTA GET A FEW SUMMONSES OVER THERE* BECAUSE QUALITY OF LIFE WENT OVER THERE AND TOOK SOME PICTURES OF SOME GUY SELLING, SELLING STUFF OVER THERE. *I HAVE TO HAVE SOME ACTIVITY* THAT WE HANDLED."

***Further Proof of the NYPD's Unlawful Quota Policy: Statistical Evidence from The OCA***

44.     The fact that the NYPD has an unlawful quota policy is further confirmed by statistical data from the New York State Office of Court Administration ("OCA"). As a result of the constant pressure to meet monthly quotas – which is causally connected to NYPD's obsession with COMPSTAT statistics – officers are driven to stop, seize, arrest and summons individuals in the absence of probable cause in order to meet the minimum quota, resulting in an marked increase in the total numbers of summonses issued by the NYPD.

45.     In fact, since 1994 – which was the inception of COMPSTAT – there has been a *five hundred percent* (500%) increase in the number of summonses issued.

46.     Further, according to the objective evidence contained in OCA's own records, the majority of summonses filed by the NYPD were issued without probable cause or any legitimate basis.

47.     In fact, of all the summonses adjudicated in the Criminal Court system – *more than half of them, or 50.5% – were dismissed* in the year 2005.

48.     This result is remarkably similar to the results from other years. For example, in 2006, *51% of all filed summonses were dismissed.* In 2007, *50.7% of all filed summonses were dismissed*. In 2008, *50.5 % of all summonses filed were dismissed.*

49.     The utterly baseless nature of these summonses is further confirmed by the large number of summonses which are dismissed before they are even docketed.

50.     Specifically, according to the 2007 Annual Report from the Criminal Court, City of New York, there were approximately six hundred one thousand four hundred and fifty seven (601,457) summonses filed within New York City.

51.     Of the aforementioned summonses issued in 2007, thirty five thousand three hundred and four (35,304) of the summonses were dismissed *before even being docketed*.

52.     In addition, of the remaining summonses that were docketed in 2007, ninety three thousand one hundred and fifty nine (93,159) were *dismissed as insufficient as a matter of law before arraignment*.

53.     Additionally, according to the 2008 Annual Report from the Criminal Court, City of New York, there were approximately five hundred sixty three thousand one hundred and fifty seven (563,157) summonses filed within New York City.

54.     Of the aforementioned summonses issued in 2008, thirty seven thousand five hundred and one (37,501) of the summonses were dismissed *before even being docketed*.

55.     In addition, of the remaining summonses that were docketed in 2008, ninety nine thousand three hundred and seventeen (99,317) were dismissed as insufficient as a matter of law before arraignment.

**The "Disappearing" Summonses: Counted By The NYPD But Not By OCA**

56.     Upon information and belief, the aforementioned number of summonses filed in 2007 and 2008 does not account for summonses recorded in COMPSTAT that are actually issued by the NYPD, but that are never filed in any criminal court in New York City.

57.     Additionally, COMPSTAT statistics would in fact contain the *total* number of summonses issued by a given precinct – whether or not they were ever filed with the court – which means that officers are still *credited with the statistic,* despite the fact that the summons was returned to the officer as defective before ever being sent to the court.

58.     As such, officers are motivated by this quota to stop, seize, arrest and summons individuals in the absence of probable cause knowing that they can meet their quota by issuing a summons for a non-existent crime or violation, which also corroborates the existence of "ghost summonses".

59.     Further upon information and belief a comparison between COMPSTAT and OCA statistics will reveal that the actual number of summonses issued is far greater than is reflected in OCA statistics.

60.     Additionally, upon information and belief, the aforementioned number of summonses in 2007 and 2008 that were never docketed and or were dismissed prior to arraignment does not account for the number of summonses that were dismissed at arraignment as being insufficient.

61.     Such incredibly high dismissal rates prior to any court appearance is presumptive evidence that those summonses were either: i) issued in order to meet a quota for offenses that never occurred; or ii) that the NYPD has shown an utterly deliberate indifference to the proper training regarding the requisite level of probable cause required to stop, arrest and summons individuals.

62.     At a minimum, according to the data actually known regarding the amount of summonses filed and dismissed in 2007 and 2008, approximately twenty three percent (23%) of the total number of summonses filed were dismissed as legally insufficient.

63.     Statistics for more recent years shows that the number of summonses filed and dismissed as legally insufficient remains high, with nineteen percent (19%) being dismissed in 2013, eighteen percent (18%) in 2014, and seventeen percent (17%) in 2015.

*Implementation of the Quota: Relentless Pressure from Superior Officers*

64.     In order to enforce the quota system outlined above, it is a routine and widespread practice that officers are constantly reminded of these quotas during roll call and receive explicit threats of tour transfers, undesirable assignments, poor performance evaluations and other adverse consequences for failure to meet their monthly arrest and summons quotas.

65.     For example, one such admonishment from a commanding officer was: "IF YOU MESS UP, HOW THE HELL [DO] YOU WANT ME TO DO THE RIGHT THING BY YOU? YOU COME IN, 5 PARKERS, 3 A'S (SUMMONSES), NO C'S (SUMMONSES) AND THE ONLY 250 YOU DO IS WHEN I FORCE YOU TO DO OVERTIME. I MEAN IT'S A TWO WAY STREET HERE. I'M OLD SCHOOL. I GOT 19, ALMOST 20 YEARS. IF I SCREWED UP, I HAD TO GIVE OUT 25 (SUMMONSES), IF I SCREWED UP I'D HAVE TO GIVE OUT DOUBLE NUMBERS."

66.     Further, evidence of the pressure facing officers to meet the required amount of summonses – which in turn results in repeated constitutional violations of New York City residents – is apparent in another supervisor's statement: "I'M KEEPING CHIEF [MARINO] AT BAY. WHEN HE PULLS ACTIVITY REPORTS GOES BACK A WHOLE YEAR, SAYS THIS GUY, THIS GIRL IS NO GOOD. BOUNCE THEM…WHEN I TELL YOU TO GET YOUR ACTIVITY UP, IT'S FOR A REASON BECAUSE *THEY ARE LOOKING TO MOVE PEOPLE AND HE'S SERIOUS.*"

***The Consequences for Officers Who Fail or Refuse to Meet Their Quota***

67.     If an officer does not meet the aforementioned quota for issuing summonses, he or she could receive punishment in the form of poor performance evaluations, loss of overtime, shift changes or denial of sick and/or vacation days.

68.     Additionally, if an officer fails to meet the quota requirement, he or she would be personally "supervised" by their platoon commander during their tour, and would be told when, where, to whom and for what a summonses.

69.     Moreover, it is made abundantly clear that performance evaluations, which lead to raises, promotions and desirable assignments, are entirely based on adherence to these quotas, thereby driving officers to issue unconstitutional summonses to meet the quota rather than suffer adverse employment consequences.

70.     Specific evidence of this fact can be found in the following supervisor's statement: "YOU'RE JUST EXPECTED TO GO OUT, YOU DON'T HAVE TO ANSWER JOBS, YOU JUST HAVE TO WRITE C'S (SUMMONSES). YOU DON'T WRITE ANY THAT NIGHT THEN YOU'LL BE BACK ON FOOT…THEY EXPECT AT LEAST TWO (2) FROM EACH, EACH OF YOU IN A CAR, TOTAL OF FOUR (4). IF YOU DO MORE EVEN BETTER…IF YOU ARE ON QUALITY OF LIFE AUTO, YOUR ASSIGNMENT FOR THE DAY IS QUALITY OF LIFE SUMMONSES, AND 250'S ALSO. LAST MONTH'S ACTIVITY REPORTS WERE GOOD BUT SOME, I STILL HAVE TO CHASE SOME OF YOU AROUND FOR 250'S AND C'S SO WERE GOING TO HAVE A LITTLE RESTRUCTURING IN JANUARY…ITS NOTHING PERSONAL ITS JUST THAT YOUR EVALUATIONS ARE

BASED ON YOUR ACTIVITY, SO I CAN'T GIVE YOU A 4 OR 4.5 IF YOU DON'T HAVE ANY ACTIVITY."

71.     All of this constant and relentless pressure to adhere to this quota policy drives officers to stop, arrest, seize and issue summonses to individuals in the absence of probable cause for offenses never committed, which is apparent from the unconstitutional acts visited upon plaintiff's herein and others similarly situated.

72.     Aside from explicit threats of punishment, officers who do not meet their quota suffer severe adverse consequences, which in some instances even rise to the level of placing their personal safety in jeopardy.

73.     For instance, P.O. Edwin Valasquez had his tour reassigned when he did not meet his summons quota despite the fact that the officers who replaced him in his tour of duty had far less experience and seniority on the job.

74.     Additionally, another officer in the 41st Precinct was punished when he documented in his memobook the fact that he was commanded by his lieutenant to suborn perjury and issue a summons for activity that he did not observe.

75.     When the lieutenant discovered what he had documented, the officer was informed that if the officer wanted the lieutenant to "forget about it" in lieu of disciplinary or other adverse action, the officer would be required him to write twenty five (25) summonses during his next tour of duty.

76.     Upon information and belief, the aforementioned officer did in fact write twenty-five (25) summonses on his next tour, which undoubtedly resulted in several constitutional violations.

77.     Further, another officer in the 42nd Precinct suffered harassment when he reported that Lieutenant Seda had commanded him to suborn perjury and write traffic and other summonses for offenses that he had not witnessed.

78.     Upon reporting the illegal directive, he found a mousetrap with his name on it and was transferred for his safety as Seda had disclosed his confidential complaint to the rest of the command and had classified him as a "fucking rat."

79.     Further, Adhyl Polanco met a similar fate when he made it known to the Internal Affairs Bureau that he had evidence of the NYPD's illegal enforcement of summons and arrest quotas.

80.     P.O. Polanco's gun and badge were removed when he attempted to accompany his sick partner to the hospital and refused to return to writing summonses at the behest of his sergeant.

81.     Further, his sergeant threatened to treat him as an EDP ("emotionally disturbed person") if he did not voluntarily surrender his gun and badge and was thereafter summarily suspended.

82.     Moreover, an officer from the 115th Precinct in Queens was actually fired for his refusal to issue summonses pursuant to an unconstitutional quota.

***Officers Who Fail To Meet Expected Quotas Are Placed Into "Performance Monitoring", Where They Face Severe Adverse Consequences***

83.     In addition to punishing officers for failing to meet quotas, as detailed above, the NYPD routinely places officers who cannot meet their quotas into "performance monitoring."

84.     For example, an unidentified officer who joined the NYPD in 1998 at the 75th Precinct had always received above average performance evaluations until 2003, when Chief Marino was assigned as the Commanding Officer at the 75th Precinct.

85.     Following Marino's assignment, the officer began to receive poor performance evaluations when he was unable to meet the minimum monthly summons requirement, which was four (4) A summonses, three (3) B summonses and three (3) C summonses.

86.     Additionally, he was placed on "performance monitoring," for his failure to meet the required number of summonses.

87.     Performance monitoring has the following three levels of severity: 1) "Level One" is in-house monitoring (Precinct level only); 2) "Level Two" involves monitoring at Police Headquarters, and carries many adverse consequences, such as loss of "paid detail"1 eligibility and home visits every time an officer takes sick leave; and, 3) "Level Three" performance monitoring is the most severe, and an officer can be fired if he or she receives three command disciplines within a six (6) month period.

88.     The subject officer was placed on "Level Two" monitoring. Eventually, this officer sought promotion to sergeant and was required to appear before the Career Advancement Review Board ("CARB"), which is typically only required for officers who have serious disciplinary issues, which he did not.

89.     Notwithstanding this officer's exemplary record – he had no disciplinary issues in his entire time with NYPD - his application for promotion was denied due to his low "activity."

90.     Moreover Chief Gianelli actually advised the officer that CARB will only review their decision if he increases his "activity." However, the officer refused to issue illegal summonses merely to increase activity.

91.     As such Employee Management Division has since refused to review CARB's decision and he has been denied promotion for nineteen (19) months – despite having scored in

the top 10% on the Sergeant's exam - all due to his failure to issue summonses pursuant to an illegal and unconstitutional quota.

92.     Instead, another officer who had identical qualifications but "high activity" was promoted to Sergeant first despite the fact that he had a criminal conviction for Drunk Driving *during* his career with NYPD.

**P.O. Schoolcraft's Harrowing Experience: Further Proof of The NYPD's Unlawful Policies**

93.     All of the aforementioned incidents notwithstanding, perhaps the most disturbing consequence for refusing to adhere to the NYPD's unconstitutional quota policy is the harrowing experience endured by P.O. Schoolcraft when he appealed his adverse performance evaluation, which was based entirely on his refusal to perpetuate this illegal quota policy.

94.     In response to his appeal, P.O. Schoolcraft was summoned to a meeting with *nine* commanding officers from his precinct, all of whom discouraged him from challenging his evaluation and admonished him that he could avoid all of this simply by bringing up his "activity."

95.     When P.O. Schoolcraft responded that he acts on every criminal or summonsable offense he observes, his superior officers suggested that he should ride with someone who has a record of issuing the required number of summonses, so that said officer could "point out" times where summonses were to be issued.

96.     Additionally, at that meeting P.O. Schoolcraft repeatedly asked the reason for his poor evaluation and the response was repeatedly referring to the low number of summonses he had issued in a given month.

97.     Finally on October 31, 2009, in retaliation for the evidence that P.O. Schoolcraft had gathered over the course of the year regarding enforcement and encouragement of meeting

summons and arrest quotas, several police officers and high-ranking NYPD officials invaded P.O. Schoolcraft's apartment and had him involuntarily committed to Jamaica Hospital in an attempt to silence P.O. Schoolcraft from disclosing the evidence he had obtained regarding illegal quotas and corruption within the NYPD.

***The Result of Relentless Quota Pressure: "Ghost Summonses" And Falsified Police Reports***

98.     As the above incidents make clear, the simple threat of such extreme consequences for failing or refusing to adhere to this illegal quota policy drives officers to simply conform to the policy, thereby resulting in hundreds of thousands of constitutional violations of New York City residents.

99.     Specifically, this blanket quota enforced on all officers is driving officers to issue summonses without probable cause for violations that never occurred, which is evidenced by information provided by both P.O. Polanco and P.O. Schoolcraft that it is widespread practice for officers to actually write "ghost summonses."

100.     The term "ghost summons" is NYPD slang for summonses issued without probable cause for crimes that did not occur, which are intentionally written defectively knowing that the individual will suffer "only" the inconvenience of being unlawfully seized during the issuance of the summons, but will never suffer the threat of prosecution; however, the officer will nonetheless still be able to meet the quota.

101.     Moreover, while on duty, P.O. Schoolcraft, in a recorded conversation with Sgt. Devino, informed her of the existence of "ghost summonses": "ITS COMMON PRACTICE HERE, FAKE 250'S, FAKE SUMMONSES BEING HANDED IN BECAUSE THEY CAN'T KEEP UP WITH THE NUMBERS."

102.    Additionally, in that conversation he informed her that these "fake" summonses were condoned and that the pressure applied by supervising officers encouraged officers to engage in this illegal practice: "[THEY] WANT NUMBERS AND THERE ARE COPS GIVING THEM FAKE NUMBERS."

103.    Illustrative of the existence of the aforementioned NYPD practice of writing "ghost summonses" in response to the constant pressure to meet quotas was the scenario that unfolded for Victor Breland, a plaintiff in the matter *Stinson, et al. v. City of New York, et al.*, 10 Civ. 4228 (RWS) (S.D.N.Y.), when he was issued a summons for disorderly conduct in front of his mother's building, when he had in fact committed absolutely no crime or violation of law.

104.    In that situation, Mr. Breland – who was merely trying to visit his sick mother – asked for a reason why he was being issued the summons, to which the officer responded, in sum and substance: "DON'T WORRY, I AM NOT GOING TO USE YOUR REAL INFORMATION. ITS JUST THAT *IT'S THE END OF THE MONTH AND I NEED TO REACH MY QUOTA*."

105.    Further, both P.O. Polanco, P.O. Schoolcraft and other unidentified officers have provided information that on numerous occasions they had witnessed to NYPD officers being commanded and ordered by sergeants, lieutenants and captains to issue summonses to individuals for offenses that they did not personally observe nor did they have any probable cause to believe had ever been committed.

***The NYPD's Unlawful Quota Policy: Selectively And Disproportionately Enforced In Minority Communities***

106.    All of the aforementioned evidence provided by P.O. Polanco and P.O. Schoolcraft also leads to the undeniable conclusion that this policy, pattern and practice is selectively and intentionally enforced in neighborhoods and areas which have a high composition of minority

residents, which disparately impacts said individuals based on an impermissible classification under the Constitution of the United States.

107.    Additionally, upon information and belief, a partial basis being the racial composition of the named plaintiff in this matter, as well as other lawsuits filed against Defendant City of New York, this policy, pattern and practice is purposely enforced in neighborhoods and areas which have a high composition of minority residents, which disparately impacts said individuals based on an impermissible classification under the Constitution of the United States.

108.    Further, officers are fully aware that they can effectively meet these quotas by issuing these unconstitutional summonses in neighborhoods comprised of predominantly minority residents because, as one unidentified officer noted: "THESE PEOPLE ARE HELPLESS AND HAVE NO RESOURCES OR THE IMPETUS TO FIGHT THIS."

109.    Additional evidence of the fact that these practices are carried out in a way that has a disparate impact on minority, African-American and Hispanic residents of New York City are statements in a meeting instructing officers that in Bedford Stuyvesant, practically "EVERYBODY HAS A WARRANT", and therefore, as to the manner of enforcing this quota policy: "TREAT EVERYBODY WITH RESPECT. BUT 'THEY,' AT 120, MALCOLM X AND BAINBRIDGE, NO…I WOULDN'T GIVE TOO MUCH [RESPECT]. THE MORE WE GIVE SUMMONSES, 250, COLLAR THEM IN THEIR BUILDING, YOU'RE PUTTING A WRENCH IN."

110.    In addition, according to NYPD's own reports, since 2007, one million seven hundred twenty four thousand nine hundred and forty eight (1,724,948) individuals have been

stopped by the NYPD and of those individuals, one million four hundred thirty nine thousand eight hundred and ninety six (1,439,896) were either African American or Hispanic.

111.     According to those statistics of the total number of individuals stopped by the NYPD since 2007, approximately eighty three percent (83%) were African American or Hispanic.

112.     Upon information and belief as well as data compiled by the NYACLU, a significant percentage of the total number of individuals stopped were issued a summons.

113.     This unconstitutional violation of the Equal Protection Clause of the Fourteenth Amendment can be inferred from all of the evidence provided by NYPD officers as well as the racial composition of all the named plaintiffs in this action (i.e. African American).

***COMPSTAT: The Driving Force Behind the NYPD's Unlawful Quota Policy***

114.     The origin of the NYPD's quota policy may be traced directly back to COMPSTAT, which was first implemented in 1994.

115.     While COMPSTAT was originally a useful law enforcement tool – helping police identify spikes of crime throughout the City – it has led the NYPD to develop an almost maniacal obsession with "numbers" that dominates their entire law enforcement philosophy.

116.     The NYPD's obsession with "numbers" begins at the precinct level. Every time a summons is issued, the issuing officers drops a copy of the summons in "the box" in the Precinct, after which it is reviewed by crime analysis in order to examine the summons for defects and/or the sufficiency of the allegations.

117.     Thereafter, the summonses that pass inspection are then sent to the court and the ones that are rejected are returned to the officers.

118.    All of the summonses issued by the officers, whether defective or sufficient, are recorded in their monthly performance reports and daily recap sheets, which are then submitted on a weekly and/or monthly basis to their sergeants and lieutenants, who thereafter submit them to the commanding officers of the Precinct.

119.    Additionally, records of those summonses are thereafter entered into the "bible," which is kept by the Commanding Officer of the Precinct.

120.    This "bible" kept by the commanding officers of every Precinct in New York City is a record of every officer's "activity," including but not limited to, the amount of summonses issued, whether defective or not.

121.    In addition to the "bible," the same statistics are recorded electronically in a computer database known as COGNOS, which is accessible to all Precincts in New York City and contains the "activity" (i.e. arrests, summonses, UF-250's) of each and every member of the NYPD.

122.    Further, the statistics that are recorded manually in the "bible" and electronically recorded in "COGNOS" are also electronically recorded in the NYPD COMPSTAT database, which is a statistical record of, among other things, all arrests, summonses, stop and frisks and reported "major" crime (*i.e.*, murder, rape, robbery, burglary, felony assault, grand larceny and grand larceny auto) city wide and broken down Precinct by Precinct.

123.    Additionally, there is a similar database that records statistics regarding traffic tickets issued called TRAFFICSTAT, which is inextricably interwoven with the summons and arrest quotas, which can also result in adverse consequences if the quota of traffic tickets are not met.

***COMPSTAT Meetings: Commanding Officers Are Berated And Disparaged, And Denied Extra
Funding, Leading To Further Pressure For Summons "Activity"***

124.    Additionally, there are weekly and monthly COMPSTAT meetings, which are

recorded on video and transcribed, and which are designed to statistically monitor arrests,

summonses, 250's and reported major crime throughout the five boroughs and Precinct by

Precinct.

125.    These meetings are organized, attended and directed by top ranking NYPD officials

throughout the five boroughs at the behest and command of the Commissioner of the NYPD.

126.    During these meetings commanding officers throughout the NYPD are berated and

denied extra funding, resources, and overtime if their Precinct's "activity" (*i.e.*, summonses,

arrests, 250's) is not in accordance with the level of "activity" required by NYPD's Commissioner.

127.    Additionally, these commanding and supervising officers are relentlessly pressured

to adhere to the required quota of C summonses (quality of life summonses) in accordance with

the pre-ordained quota for each individual Precinct throughout the five boroughs.

128.    In response to this policy, commands within the five boroughs routinely set "special

summons details" in order to artificially increase the number of summonses issued, resulting in

the issuance of hundreds of thousands of unconstitutional summonses.

129.    Commanding officers who attend these meetings know in advance that they will

get "ripped apart" by NYPD brass if there is a spike in crime in their precincts.

130.    Commanding Officers who attend these COMPSTAT meetings – which are viewed

by other commanding officers on the NYPD's Intranet – are well aware and understand that the

NYPD's allocation of additional funding, resources, benefits, and overtime are completely dictated

by the statistics that appear in COMPSTAT which are ultimately reviewed by the NYPD's Commissioner and the policy making officials at One Police Plaza.

***The NYPD's Response to COMPSTAT Pressure: Blatant Manipulation of Crime Statistics Resulting in an Unconstitutional Summons Quota***

131.    Based on the above, it is in the Commanding Officer's best interest – career-wise and as far as their own Precinct's funding is concerned – to make two very specific things appear in COMPSTAT statistics: 1) a *decrease* in reported "major" crime (i.e. murder, rape, robbery, burglary, felony assault, grand larceny, grand larceny auto), and 2) an *increase* in "activity" (i.e. arrests, summonses, 250's), in order to perpetuate an erroneous belief that the two categories are causally related, which has dictated the NYPD's allocation of funding and resources.

132.    Additionally, it is equally in Defendant City of New York's best interest to perpetuate the belief that statistics justify and prove the need to have an increased police force and increased amount of public funding for same.

133.    In furtherance of these policies and interests, Defendant City of New York has effectively created a situation where Precincts, if they are to be allocated additional resources and funding, need to artificially create the appearance of a causal relationship between theses statistical categories.

134.    In doing so, this policy has created intense pressure on officers and has driven them to meet a quota of high summons activity every month and as such has caused officers to consistently violate the constitutional right of hundreds of thousands of New York City residents by arresting, detaining, seizing and issuing summonses to them in the absence of probable cause, when in fact no violation has ever occurred.

135.    Further P.O. Schoolcraft, P.O. Polanco and scores of other unidentified officers who have come forward, have provided evidence that in order to artificially create the appearance of the statistical correlation that, as a result of high "activity," "major" crime is therefore reduced, commanding and supervising officers routinely direct officers to discourage citizens from making reports of major crimes, refuse to take reports from citizens who desire to make them and/or downgrade major crime reports to reflect only petit or minor offenses (*i.e.*, robbery report is manipulated to reflect only "lost property").

136.    Evidence of this can be seen in the following statement: "IF THE CV (COMPLAINING VICTIM) WANTS TO MAKE A REPORT OF A ROBBERY, BUT THEY DON'T WANT TO HELP US OUT, LOOK THROUGH PHOTOS, YOU DON'T NEED TO TAKE THAT REPORT."

137.    Additionally, in one instance in March of 2009, Deputy Inspector Mauriello refused to take a grand larceny automobile report, which would otherwise classify as a "major" crime for COMPSTAT, from an individual due to his prior criminal record, stating,

> Mauriello: "WHAT DO YOU MEAN YOUR CAR WAS MISSING."
>
> Victim: "I PARKED IT THERE, WOKE UP TODAY, GONE."
>
> Mauriello: "EVER BEEN ARRESTED BEFORE?"
>
> Victim: "YEAH DID 6-8 YEARS FOR FELONY DRUGS AND A GUN."
>
> Mauriello: "SO MAYBE YOU THINK KARMA WOKE UP THIS AM AND TOOK YOUR CAR."

138.    Further proof that the NYPD is consumed and utterly driven by numbers and statistics, much of which is false, is apparent from statements of supervising officers, such as,

"YOU CAN BE THE BEST COP IN THE WORLD, YOU DON'T WRITE IT DOWN ON A PIECE OF PAPER, YOU DIDN'T DO IT. OPPOSITE, YOU COULD BE THE WORST COP IN THE WORLD; YOU'RE A WRITER, BEST COP IN THE WORLD. IT'S ALL PAPERWORK."

139.    In fact all of NYPD's funding and incentives are based entirely on statistics, creating a driving force to manufacture or create statistics for offenses that never happened, as one supervisor stated: "JUST KEEP THE HOUNDS OFF. A PARKER [PARKING VIOLATION]. A 250 [STOP AND FRISK]. SOMEONE WALKING DOWN THE STREET. YOU KNOW WHAT, I STOPPED AN ASSHOLE, I DID A 250, LET HIM GO. HE DIDN'T HAVE ANY INFORMATION. WHO CARES? IT'S STILL A 250. YOU KNOW WHAT, THAT KEEPS A SMILE ON THE [SUPERVISOR'S] FACE."

140.    Further evidence can be found in statements like the one a Sergeant made in October 18, 2009: "AGAIN, IT'S ALL ABOUT THE NUMBERS."

141.    Additionally, impact overtime, which is supplementary overtime allotted to certain Precincts, is only given to officers with the requirement that they issue a minimum number of summonses and/or arrests during said overtime shift.

142.    Moreover, any officers who failed to meet the overtime summons/arrest quota during their overtime shifts would not be given overtime in the future.

143.    Further evidence of this deliberate manipulation and creation of artificial statistics, which leads to repeated constitutional violations, can be gleaned from the fact that officers are instructed to increase their activity in furtherance of this policy in response to major crimes being reported to again create the artificial appearance of a causal relationship between high activity and low reported major crime.

144. An example of this can been seen in this statement: "A SHOOTING [AT] MIDNIGHT ON CHAUNCEY, SO DO SOME 250'S COMMUNITY VISITS, C SUMMONSES…THE USUAL *BULLSHIT*."

145. As such, the NYPD's policy of distributing resources based on this false statistical correlation with COMPSTAT data has been the driving force behind officers manufacturing or creating "activity" that does not exist resulting in the issuance of hundreds of thousands of unconstitutional summonses in the absence of probable cause.

## JURISDICTION AND VENUE

146. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

147. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and 1367(a).

148. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## JURY DEMAND

149. Mr. Graves demands a trial by jury in this action.

## PARTIES

150. Plaintiff Bernard Graves is a resident of the County of Queens, State of New York.

151. Defendant City of New York is a municipal organization organized under the laws of the State of New York.

152. Defendant City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant City of New York.

153.    The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

154.    At all times relevant herein, Defendant Police Officer Brian Mecseri ("Mecseri") was an officer, employee, and/or agent of Defendant City of New York.

155.    At all times relevant herein, Defendant Mecseri was acting within the scope of his employment with Defendant City of New York.

156.    At all times relevant herein, Defendant Mecseri was acting under color of state law.

157.    Defendant Mecseri is sued in his individual and official capacities.

158.    At all times relevant herein, Defendants John/Jane Doe # 1 - 20 were supervisors, officers, employees, and/or agents of Defendant City of New York.

159.    At all times relevant herein, Defendants John/Jane Doe # 1 - 20 were acting within the scope of their employment with Defendant City of New York.

160.    At all times relevant herein, Defendants John/Jane Doe # 1 - 20 were acting under color of state law.

161.    Defendants John/Jane Doe # 1 - 20 are sued in their individual and official capacities.

162.    The names John/Jane Doe # 1 - 20 are fictitious, their true names being unknown to Mr. Graves at this time.

## **STATEMENT OF FACTS**

163.    On July 20, 2013, Mr. Graves and a group of relatives and friends hung out in Manhattan for the evening.

164.    Upon leaving Manhattan in the early hours of July 21, 2013, the group traveled in separate cars, driving through Brooklyn to drop people off.

165.    Mr. Graves was driving his own vehicle.

166.    Another vehicle in the group belonged to Mr. Graves's sister, Erika Key, and was being driven by her friend.

167.    An accident occurred between Erika Key's vehicle and a cab at or near the intersection of Bedford Avenue and Lafayette Avenue in Brooklyn, New York.

168.    Someone called police to respond to the scene of the accident, and Mr. Graves parked his vehicle nearby.

169.    Mr. Graves got out of his vehicle and walked over to the location of the accident.

170.    When Mr. Graves arrived there were two officers at the scene trying to determine who was driving the vehicles involved in the accident.

171.    An NYPD van and vehicles arrived at the scene at that time, as well.  Several officers got out of the van and officers exited the other vehicles.

172.    One of the individual defendants yelled out "That's him!  Get him!"

173.    The individual defendants began attacking Mr. Graves, punching him in the back of his head and placed Mr. Graves in handcuffs.

174.    Mr. Graves's arrest was without probable cause.

175.    Mr. Graves's arrest was approved at the scene of the arrest by the individual defendant who was acting as the supervising officer.

176.     The individual defendants purposefully placed the handcuffs on Mr. Graves's wrists so tightly that they caused lacerations, bruising, numbness, and a tingling sensation in his hands.

177.     The individual defendants shoved Mr. Graves into the back of a police vehicle.

178.     Mr. Graves, who was protesting against his arrest, attempted to stand up.

179.     The individual defendants violently struck Mr. Graves about his head, ribs, chest, back, and head, and then shoved Mr. Graves in the vehicle and closed the door.

180.     Mr. Graves was transported to a police precinct.

181.     During the ride to the precinct, Mr. Graves begged the individual defendants who were transporting him to loosen the handcuffs as they were too tight and injuring him, but the individual defendants refused.

182.     Once at the precinct, the individual defendants shoved Mr. Graves into a cell, and refused to remove the handcuffs, although Mr. Graves begged them to.

183.     Mr. Graves remained handcuffed in the cell until approximately 7 a.m. and released from the precinct.

184.     Mr. Graves was not told of any charges against him, and was not presented with a summons or desk appearance ticket.

185.     A few months after his arrest, Mr. Graves received a phone call and was told that he did not need to go to court, and that all of the charges against him had been dismissed.

186.     This came as a surprise to Mr. Graves, who had been completely unaware that there were ever any charges against him.

187.    Upon information and believe, and pursuant to a notice sent in the matter *Stinson, et al. v. City of New York, et al.*, 10 Civ. 4228 (RWS) (S.D.N.Y.), the individual defendants issued Mr. Graves a Criminal Court Summons ("C Summons") numbered 4406421087.  The notice in that matter was sent pursuant to the terms of a class settlement offer, which Mr. Graves has chosen to opt out of.

188.    Upon information and believe, the foregoing C Summons was dismissed for facial or legal insufficiency.

189.    Alternatively, and upon information and belief, the individual defendants spoke with the Kings County District Attorneys' Office, individually and collectively lying to the Kings County District Attorney's Office that Mr. Graves had violated one or more sections of the New York Penal Law.

190.    Upon information and belief, based on these fabricated allegations, the Kings County District Attorney's Office forwarded to the individual defendants a Criminal Court Complaint.

191.    Upon information and belief, the Criminal Court Complaint was reviewed and then signed by the individual defendants.

192.    Upon information and belief, when reviewing and signing the Criminal Court Complaint, the individual defendants knew the allegations contained therein to be false.

193.    Upon information and belief, the executed Criminal Court Complaint was then forwarded by the individual defendants to the Kings County District Attorney's Office.

194.    Alternatively, upon information and belief, the individual defendants issued Mr. Graves a summons or desk appearance ticket, and forwarded the summons and/or desk appearance to members of the Kings County District Attorney's Office.

195.    Legal process was issued against Mr. Graves.

196.    During the pendency of the criminal proceeding, the individual defendants forwarded false evidence to the Kings County District Attorney's Office, *inter alia*, arrest reports, complaint reports, evidence vouchers, and property vouchers.

197.    Mr. Graves suffered damage as a result of Defendants' actions.  Mr. Graves was, *inter alia*, deprived of liberty and suffered emotional distress, physical injury, mental anguish, fear, pain, anxiety, embarrassment, humiliation, and damage to reputation.

## FIRST CAUSE OF ACTION
### *42 U.S.C. § 1983*

198.    Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

199.    Defendants, by their conduct toward Mr. Graves as alleged herein, violated Mr. Graves's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

200.    As a direct and proximate result of this unlawful conduct, Mr. Graves sustained the damages alleged herein.

## SECOND CAUSE OF ACTION
### *Unlawful Stop and Search*

201.    Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

202.     The individual defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Graves without reasonable suspicion.

203.     As a direct and proximate result of this unlawful conduct, Mr. Graves sustained the damages alleged herein.

### THIRD CAUSE OF ACTION
#### *False Arrest*

204.     Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

205.     The individual defendants violated the Fourth and Fourteenth Amendments because they arrested Mr. Graves without probable cause.

206.     As a direct and proximate result of this unlawful conduct, Mr. Graves sustained the damages alleged herein.

### FOURTH CAUSE OF ACTION
#### *Excessive Force*

207.     Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

208.     The individual defendants violated the Fourth and Fourteenth Amendments because they used unreasonable force on Mr. Graves.

209.     As a direct and proximate result of this unlawful conduct, Mr. Graves sustained the damages alleged herein.

### FIFTH CAUSE OF ACTION
#### *Denial of Substantive Due Process*

210.     Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

211.    The individual defendants created false evidence against Mr. Graves.

212.    The individual defendants forwarded false evidence to prosecutors in the Kings County District Attorney's Office.

213.    In creating false evidence against Mr. Graves, and in forwarding false evidence to prosecutors, the individual defendants violated Mr. Graves's right to substantive due process under the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution of the United States.

214.    As a direct and proximate result of this unlawful conduct, Mr. Graves sustained the damages alleged herein.

## SIXTH CAUSE OF ACTION
### *Malicious Abuse of Process*

215.    Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

216.    The individual defendants issued and/or caused to be issued legal process to place Mr. Graves under arrest.

217.    The individual defendants arrested Mr. Graves in order to obtain collateral objectives outside the legitimate ends of the legal process, to wit, to cover up their unlawful stop and search of Mr. Graves.

218.    The individual defendants pursued these collateral objectives after issuance of legal process by, *inter alia*, forwarding false evidence to the Kings County District Attorney's Office and continuing to participate in the prosecution of Mr. Graves.

219.    The individual defendants acted with intent to do harm to Mr. Graves without excuse or justification.

220.    As a direct and proximate result of this unlawful conduct, Mr. Graves sustained the damages alleged herein.

**SEVENTH CAUSE OF ACTION**
*Malicious Prosecution*

221.    Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

222.    The individual defendants initiated the criminal proceedings against Mr. Graves by issuing and/or causing to be issued legal process against Mr. Graves.

223.    The individual defendants lacked probable cause to commence the criminal proceedings against Mr. Graves.

224.    The individual defendants' actions were motivated by actual malice.

225.    The criminal proceedings were terminated in favor of Mr. Graves.

226.    As a direct and proximate result of this unlawful conduct, Mr. Graves sustained the damages alleged herein.

**EIGHTH CAUSE OF ACTION**
*Failure to Intervene*

227.    Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

228.    Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

229.    Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

230.    As a direct and proximate result of this unlawful conduct, Mr. Graves sustained the damages alleged herein.

## NINTH CAUSE OF ACTION
### *Monell*

231.    Mr. Graves repeats and realleges each and every allegation as if fully set forth herein.

### *The Unconstitutional Custom, Policy and Practice of the NYPD*

232.    At all relevant times, the City, acting through the NYPD, maintained an express and de facto policy, custom and practice of issuing summonses without probable cause in order to meet quotas requiring a certain volume of summonses be issued throughout New York City.

233.    This quota policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

234.    Upon information and belief a high percentage of those summonses issued were not based upon probable cause or any legitimate basis under the law, but were pursuant to the NYPD's policy pattern and practice of having subordinate officers issue summonses in order to meet quotas established by Defendant City of New York.

235.    Upon information and belief this pattern and practice has a knowingly disparate impact on plaintiff and other African American individuals, in violation of their Constitutional rights as secured by the Fourth and Fifth Amendments and the Equal Protection Clause of the Fourteenth Amendment.

236.    Upon information and belief, the issuance of summonses regardless of probable cause or any legitimate basis under the law in order to meet quotas and goals given to the officers

is well known and in fact encouraged throughout the NYPD. Nevertheless, Defendant City of New York continues to allow police officers to continue the practice, tolerate and encourage these unconstitutional practices.

237. Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

238. Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

239. Active officers are given promotion and overtime opportunities that are not afforded to inactive officers.

240. The quota policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are not.

241. Defendant City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully. There are no post-arrest investigations that are performed, and no policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

242. Defendant City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to proper counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

243. The failure of Defendant City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence,

and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

244.   The conduct of the NYPD's policy-making defendants, including its Commissioner, has been a substantial factor in the continuance of the issuance of these summonses in the absence of probable cause or any legitimate basis under the law only to meet quota requirements set forth by the NYPD has been a substantial factor in the continuance of such arrests and summonses and a proximate cause of the constitutional violations alleged in this complaint.

245.   Defendant City of New York, through the NYPD, has a *de facto* overtime policy that encourages and incentivizes unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

246.   Defendant City of New York, through the NYPD, provides officers, including the individual defendants herein, with overtime opportunities when arrest are made, or summonses and desk appearance tickets are issued.

247.   Upon making an arrest or issuing summons or desk appearance ticket, an arresting officer submits a request for overtime to his commanding officer.

248.   These requests are essentially rubberstamped, with commanding officers performing no investigation into the circumstances of the arrest.

249.   Defendant City of New York, through the NYPD, does not perform any post-arrest investigation and there are no policies in place to prevent abuse of this overtime policy.

250.   As a result of this overtime policy, officers, including the individual officers named herein, abuse this overtime policy, making baseless arrests and wrongfully issuing summonses and desk appearance tickets to substantially supplement their income through overtime pay.

*NYPD's Deliberate Indifference to Training and Supervision of Officers*

251.   In light of the hundreds of thousands of summonses that are dismissed in a calendar year that are actually documented as being dismissed - in addition to the summonses that were never filed or were dismissed at or after arraignment - is representative of the fact that defendants either knew or should have known, that many police officers and supervisory personnel were engaging in the lawless and unconstitutional practice of issuing individuals summonses regardless of probable cause or any legitimate basis under the law; yet defendants have repeatedly failed to take any action to end this conduct, and in fact expressly and/or tacitly encourage the lawless and unconstitutional actions.

252.   The NYPD's failure to train, discipline or supervise officers regarding their obligation not to issue summonses unless based upon probable cause or some legitimate basis under the law, exhibited gross and wanton deliberate indifference to the constitutional rights of Mr. Graves.

253.   Defendants' persistent failure to take measures to curb this unconstitutional practice constitutes acquiescence in the known unlawful behavior of their subordinates. The prevalence and general knowledge of these summonses and the rate of their dismissal, and the failure of supervisory defendants to take remedial action, constitute deliberate indifference to the rights of Mr. Graves.

254.   Because the pattern and practice of arresting individuals and issuing summonses absent probable cause in furtherance of meeting quotas and requirements has existed for many years, the defendants knew and encouraged this unconstitutional behavior and repeatedly failed to take action to end this conduct by subordinate officers.

255.    Because this explicit and/or tacit pattern and practice existed of arresting individuals and issuing summonses absent probable cause in furtherance of the quota policy, defendants knew or should have known that police officers assigned to Precincts within New York City required training, supervision, and discipline regarding their obligations not to issue summonses absent probable cause or any legitimate basis under the law.

256.    The NYPD and the City of New York, through its agents and employees has failed or refused to hold accountable high-ranking supervisors, commanding officers and subordinate officers, notwithstanding the existence of widespread misconduct over a period of many years. This failure is the proximate cause of the injuries sustained by Mr. Graves

257.    This is not an isolated incident.  Defendant The City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Mr. Graves.

258.    Defendant City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

259.    Defendant The City of New York, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

260.    Defendant The City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

261.   These policies, practices, and customs were the moving force behind Mr. Graves's injuries.

PRAYER FOR RELIEF

WHEREFORE, Mr. Graves respectfully requests judgment against Defendants as follows:

(a)   Compensatory damages against all defendants, jointly and severally;

(b)   Punitive damages against the individual defendants, jointly and severally;

(c)   Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d)   Such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        April 7, 2017

                    By:    /s/
                           Gregory P. Mouton, Jr., Esq.
                           MoutonDell'Anno LLP
                           *Attorneys for Plaintiff Bernard Graves*
                           305 Broadway, 7th Floor
                           New York, NY  10007
                           Phone & Fax: (646) 706-7481

16 CV 2268 (MKB) (VMS)
_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

BERNARD GRAVES,

Plaintiff,

-against-

CITY OF NEW YORK, POLICE OFFICER BRIAN MECSERI, and JOHN/JANE DOE # 1 -
20,

Defendants.
_____

SECOND AMENDED COMPLAINT
_____

**MOUTON**DELL'ANNO **LLP**

305 Broadway, 7th Floor
New York, NY  10007
Phone & Fax: (646) 706-7481